**UNITED STATES of America**

v.

**Robert CARPIO–SANCHEZ, Appellant.**

**No. 07–2823.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Dec. 1, 2008.

Opinion filed: Dec. 1, 2008.

---

Judy G. Smith, Office of United States Attorney, Philadelphia, PA, for Appellee.

Joel H. Slomsky, Philadelphia, PA, for Appellant.

Before: AMBRO, WEIS, and VAN ANTWERPEN, Circuit Judges.

## OPINION

AMBRO, Circuit Judge.

Roberto Carpio–Sanchez challenges the sufficiency of the evidence for his conviction of conspiracy to possess with intent to distribute, and possession with intent to distribute, more than 200 kilograms of cocaine. Because we conclude that the evidence was sufficient for a jury to convict Carpio–Sanchez, we affirm the judgment of the District Court.

### I.

In December 2005, Carpio–Sanchez leased a warehouse in Allentown, Pennsylvania for $2,400 per month. Shortly thereafter, his uncle, Isael Sanchez–Mercedes (who lived with Carpio–Sanchez), arranged a drug transaction between a cocaine supplier in Mexico and a regular customer of Sanchez–Mercedes in New York.

According to Sanchez–Mercedes's arrangement, a tour bus carrying 238 kilograms of cocaine in a secret compartment was to arrive in Allentown on February 7, 2006. On the bus's arrival, two co-conspirators, Jose Antonio Aguirre–DeLeon and Santiago Salinas–Cortez, were to drive it to Carpio–Sanchez's warehouse for transfer of the drugs into a white van.

Aguirre–DeLeon and Salinas–Cortez flew to Newark, New Jersey on February 5, 2006, where they met Sanchez–Mercedes. The next day, they drove with Sanchez–Mercedes and Carpio–Sanchez along the route they were to take to the warehouse when the bus arrived. All four men then went to the warehouse, to which Carpio–Sanchez had a key, to investigate whether the doorway was large enough for the bus.

When the bus arrived on February 7, Carpio–Sanchez drove Aguirre–DeLeon and Salinas–Cortez to meet it. He also reviewed the route to the warehouse with them, took them to lunch, and drove them to purchase tools needed to access the secret compartment on the bus. Aguirre–

DeLeon followed Carpio–Sanchez's vehicle when moving the bus to the warehouse. All of these movements were observed by the police.

After Aguirre–DeLeon backed the bus into the warehouse, he, along with Salinas–Cortez and Sanchez–Mercedes, closed the warehouse doors and moved the cocaine into the white van. Carpio–Sanchez remained outside on watch during this time. When the drug transfer was complete, Sanchez–Mercedes drove the white van out of the warehouse, spoke with Carpio–Sanchez, and drove away. Carpio–Sanchez then drove his vehicle into the warehouse, where Aguirre–DeLeon was reassembling the bus's secret compartment.

Shortly thereafter, state troopers lawfully stopped, searched, and arrested all four men. When officers searched the white van, they discovered the 238 kilograms of cocaine—worth approximately $4,000,-000—along with numerous personal papers and photographs belonging to Carpio–Sanchez. Officers also recovered $160,329 in cash from the bus.

At trial, the Court was clear that "the government must prove beyond a reasonable doubt that [Carpio–Sanchez] conspired to possess or possessed with the intent to distribute some type of controlled substance." 2007 WL 1199334, *3 (E.D.Pa. April 19, 2007). The jury returned a verdict of guilty on one count of conspiracy to possess with intent to distribute more than 200 kilograms of cocaine, in violation of 21 U.S.C. § 846, and one count of possession with intent to distribute more than 200 kilograms of cocaine and aiding and abetting of the same, in violation of 18 U.S.C. § 841(a)(1).

After trial, Carpio–Sanchez moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a) and (c) on the basis that the evidence was insufficient to sustain the verdicts. The Court denied his motion and sentenced him to serve concurrent sentences of 151 months on each count.

Carpio–Sanchez maintains on appeal that the District Court erred in concluding that the evidence presented at trial was sufficient to permit the jury to find him guilty. We have jurisdiction under 28 U.S.C. § 1291.

## II.

"Our review of the sufficiency of the evidence after a conviction is 'highly deferential.'" *United States v. Hart,* 273 F.3d 363, 371 (3d Cir.2001). We do not weigh the evidence or decide the credibility of witnesses. *See United States v. Cothran,* 286 F.3d 173, 175 (3d Cir.2002). Instead, "[w]e must view the evidence in the light most favorable to the Government and sustain the verdict if any rational juror could have found the elements of the crime beyond a reasonable doubt." *Id.*

To prove conspiracy, the Government must show that the conspirators shared a "'unity of purpose,' the intent to achieve a common goal, and an agreement to work together toward the goal." *United States v. Wexler,* 838 F.2d 88, 90 (3d Cir.1988). Accordingly, "the government must have put forth evidence 'tending to prove that defendant entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment.'" *United States v. Idowu,* 157 F.3d 265, 268 (3d Cir.1998). "[I]nferences from established facts are accepted methods of proof when no direct evidence is available so long as there exists a logical and convincing connection between the facts established and the conclusion inferred." *United States v. Cartwright,* 359 F.3d 281, 287 (3d Cir.2004) (citation omitted).

Carpio–Sanchez acknowledges that the evidence presented by the Government is

sufficient to support a finding that he conspired to smuggle illegal goods, but he argues that the Government failed to show he knew the specific purpose of the conspiracy was to import cocaine. To support his assertion that this evidentiary shortcoming mandates his acquittal, Carpio–Sanchez cites cases in which we reversed drug possession and distribution conspiracy convictions for lack of evidence that the defendant knew the purpose of the conspiracy involved drugs. *See, e.g., Cartwright,* 359 F.3d at 286–90 (concluding that the evidence showed only that a defendant served as a lookout and possessed a firearm, pager, and cellular phone); *Idowu,* 157 F.3d at 268–70 (instructing the District Court to acquit a defendant who merely carried a bag of money and a suitcase containing drugs for a dealer); *United States v. Thomas,* 114 F.3d 403, 405–06 (3d Cir.1997) (reversing a drug runner's conviction because the police could not prove a prior relationship with a drug dealer); *Wexler,* 838 F.2d at 91–92 (reasoning that the evidence was "just as consistent ... with a conspiracy to transport stolen goods, an entirely different crime"). These cases do not help Carpio–Sanchez, however, because the facts here do not show a similar evidentiary deficiency.

The Government presented evidence that Carpio–Sanchez: (1) leased and controlled access to the warehouse where 238 kilograms of cocaine were delivered and openly handled; (2) spent two days escorting Salinas–Cortez and Aguirre–DeLeon around Allentown, including showing them the route to the warehouse and taking them to purchase tools needed to access the drugs in the bus; (3) was observed by police officers engaging in surveillance activities; (4) was in the warehouse during the time that Aguirre–DeLeon reassembled the secret compartment in the bus; (5) had numerous personal papers and belongings in the van used to deliver the drugs; and (6) engaged in regular communications with Sanchez–Mercedes, his drug-dealing, live-in uncle. These facts presented sufficient evidence of Carpio–Sanchez's knowledge of the bus's cargo to allow a rational juror to infer beyond a reasonable doubt that he conspired to distribute cocaine.

This conclusion is supported by our prior decisions in *United States v. Reyeros,* 537 F.3d 270, 277–79 (3d Cir.2008), and *United States v. Iafelice,* 978 F.2d 92, 97 (3d Cir.1992). In *Reyeros,* we noted that a jury could reasonably infer that a defendant who assisted his brother in a drug transaction would ask "the nature of the contraband for which he was putting his ... career at risk." 537 F.3d at 279 n. 12. Here, similar reasoning implies that Carpio–Sanchez would ask his uncle about the nature of the illegal goods for which he was risking his livelihood. We also stated in *Reyeros* that it was reasonable to assume that the defendant "would want to know the nature of the contraband so that he could understand the expected payoff." *Id.* Given the investment that Carpio–Sanchez made in leasing the warehouse, it is likewise reasonable to assume that he would want to know the kind of goods he was trafficking and how much he would earn from their sale.

In *Iafelice,* we held that a defendant's "[o]wnership and operation of the car [used to transport drugs] are highly relevant facts that could reasonably have been considered by a jury in evaluating his knowledge of, and dominion and control over, the drugs." 978 F.2d at 97. We noted as well that the defendant's ownership of the vehicle was the "crucial additional fact" that "truly distinguish[ed] his case from the more limited facts of *Wexler.*" *Id.* at 97–98. Carpio–Sanchez's leasing of and control over the warehouse used to receive and transfer drugs provide simi-

lar essential evidence demonstrating his guilty knowledge.

Taken together, the evidence presented by the Government sufficiently supported the conclusion that Carpio–Sanchez knew he was involved in a conspiracy to distribute cocaine. As the knowledge element is the same for the distribution charge and its aiding and abetting component, the evidence presented by the Government was also sufficient to allow the jury to convict Carpio–Sanchez on those counts.[1]

### III.

For the foregoing reasons, we affirm the judgment of the District Court.

[1] We have considered all other arguments made by the parties on appeal, and we conclude that no further discussion is necessary.