

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-31-2008

# USA v. Reyeros

Precedential or Non-Precedential: Precedential

Docket No. 06-1485

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Reyeros" (2008). *2008 Decisions.* Paper 742.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/742

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 06-1485

UNITED STATES OF AMERICA

v.

JORGE REYEROS,

Appellant

(D.C. No. 00-cr-00822-1)

No. 06-1486

UNITED STATES OF AMERICA

v.

JUAN REYEROS,

Appellant

(D.C. No. 00-cr-00822-2)

On Appeal from the United States District Court
for the District of New Jersey
District Judge: Honorable William G. Bassler

Argued: April 17, 2008

Before:   SLOVITER, JORDAN, and ALARCON*, *Circuit
Judges.*

(Filed: July 31, 2008)

Peter Goldberger   [ARGUED]
Law Office of Peter Goldberger
50 Rittenhouse Place
Ardmore, PA   19003-2276

Paul D. Petruzzi
100 N. Biscayne Blvd., Suite 1100
Miami, FL   33132

*Honorable Arthur L. Alarcon, Senior Judge, United
States Court of Appeals for the Ninth Circuit, sitting by
designation.

Neil M. Schuster
555 Northeast 15th Street, Suite 2C
Miami, FL   33132

     *Counsel for Appellant Jorge Reyeros*

Neil M. Schuster   [ARGUED]
555 Northeast 15th Street, Suite 2C
Miami, FL   33132

     *Counsel for Appellant Juan Reyeros*

George S. Leone
Caroline A. Sadlowski   [ARGUED}
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ   07120

     *Counsel for Appellee USA*

---

OPINION OF THE COURT

---

JORDAN, *Circuit Judge*.

     A jury convicted Jorge Reyeros and his brother, Juan Reyeros, of offenses related to a conspiracy to import cocaine

3

into the United States.[1]  On appeal, each brother challenges his conviction and Juan additionally challenges his sentence. Although both raise a number of issues on appeal, we focus primarily on, first, Jorge's contention that the evidence was insufficient to establish beyond a reasonable doubt that he knew that the purpose of the conspiracy was to import cocaine and, second, the brothers' shared contention that they were improperly denied access to certain documents in the possession of the Colombian government, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and the Jencks Act, 18 U.S.C. § 3500.  For the reasons set forth below, we will affirm.

## I.    Background

On August 20, 2004, a federal grand jury sitting in the District of New Jersey returned a second superseding indictment (the "Indictment") against Jorge, Juan, Hernan Uribe, and Rafael Garravito-Garcia.  During the time period charged in the Indictment, Jorge was employed as an inspector for the United States Customs Service[2] ("Customs")

---

[1]For convenience, we will refer to the brothers by their first names.

[2]In 2003, after the events at issue here, the United States Customs Service was divided into the Bureau of Customs and Border Protection and the Bureau of Immigration and Customs Enforcement, both of which are part of the Department of Homeland Security.  Reorganization Plan Modification for the Department of Homeland Security, H.R.

4

in New Jersey. Counts 1 through 4 of the Indictment named only Jorge and charged him, in Count 1, with conspiracy to import cocaine, in violation of 21 U.S.C. § 963, and, in Counts 2 through 4, with exceeding authorized access to a Customs computer, in violation of 18 U.S.C. §§ 1030(a)(2)(B), (c)(2)(B) and 2. Specifically, the Indictment alleged that, in 1997, Jorge conspired with unnamed co-conspirators to import into the United States cocaine concealed in cargo containers. It also alleged that Jorge had, on multiple occasions in 1997, unlawfully accessed a Customs computer database, obtained information identifying containers designated for inspection by Customs, and provided that information to his co-conspirators in furtherance of the conspiracy.

Count 5 of the Indictment charged Jorge, Juan, Uribe, and Garravito-Garcia with a separate conspiracy to import cocaine, in violation of 21 U.S.C. § 963, while Count 6 charged them with exceeding authorized access to a Customs computer and aiding and abetting exceeding authorized access, in violation of 18 U.S.C. §§ 1030(a)(2)(B), (c)(2)(B) and 2.[3] The allegations of Count 5 are that, in 1999, Jorge, Juan, Uribe, and Garravito-Garcia agreed to import cocaine into the United States from Ecuador, concealed in cargo containers filled with produce bound for Port Elizabeth, New

Doc. No. 108-32 (2003).

[3]The defendants were also charged with having attempted to exceed authorized access, but it appears that aspect of the charge was not a focus at trial.

Jersey. Count 6 describes how, in furtherance of that conspiracy, Jorge unlawfully accessed a Customs computer database in 1999 to research a company his co-conspirators had identified as a potential recipient of the smuggled cocaine.

The trial against Jorge and Juan began in October 2004. At some point, Juan moved for severance;[4] however, his request was denied by the District Court. Thus, at trial the government presented evidence of the 1997 conspiracy and associated charges set forth in Counts 1 through 4 of the Indictment, which named only Jorge as a defendant, and it also presented evidence of the 1999 conspiracy and unauthorized access charges set forth in Counts 5 and 6 of the Indictment, which named both Jorge and Juan along with Uribe and Garravito-Garcia.

Uribe testified at trial on behalf of the government. When the trial began, Uribe was in a Colombian prison, where he was serving a sentence for drug trafficking and conspiracy. He was, however, extradited to the United States during the trial and immediately entered into a plea agreement pursuant to which he agreed to cooperate with the government.[5] At trial, Uribe testified that he became involved

_____

[4]It is not clear from the record when Juan first made that motion.

[5]The charges against Garravito-Garcia, the fourth defendant named in the Indictment, were dismissed without prejudice on January 18, 2007, apparently because the government has

6

in the 1999 conspiracy when Juan asked him for help identifying an American company through which 400 to 500 kilograms of cocaine could be imported into the United States. Uribe stated that Juan told him that Jorge was a Customs inspector and could use that position to ensure containers containing drugs could enter the United States without being inspected.

Uribe described how he sought the help of Garravito-Garcia to find an American company suitable to receive the smuggled cocaine. Garravito-Garcia, in turn, contacted an American acquaintance, James Lagrotteria, for assistance. Unbeknownst to the conspirators, however, Lagrotteria was an informant for Customs and the United States Drug Enforcement Administration ("DEA").

Garravito-Garcia introduced Uribe to Lagrotteria in Colombia in March 1999 and the three men met to discuss plans to import cocaine into the United States. At that meeting, Lagrotteria was tasked with identifying an American company suitable for receiving the imported cocaine, particularly one with a warehouse in New York or New Jersey and a history of importing produce. Lagrotteria was told that the conspirators were working with a Customs official[6] and that the official planned to check a Customs computer

---

been unable to locate him.

[6]At some point, again it is not clear, Lagrotteria became aware of Juan's and Jorge's roles in the conspiracy, including that Jorge was the insider at Customs.

database to see if any company Lagrotteria identified had been flagged by Customs as having previously imported contraband.

In April 1999, Customs and DEA agents fabricated records for a fictitious company they named "TJ Import Produce." They put the records in a Customs database and, on April 8, 1999, at the behest of the government agents, Lagrotteria informed Garravito-Garcia that he had identified TJ Import Produce as a potential recipient of the cocaine the conspirators hoped to import. A few days later, on April 12, 1999, Jorge accessed the Customs computer database and examined the mock importation and inspection records for TJ Import Produce. Subsequently, Uribe informed Lagrotteria that TJ Import Produce had been investigated and was suitable.

Later that April, Lagrotteria traveled to Colombia to meet Juan and to discuss with Uribe and Juan the conspirators' plans to import cocaine. At that meeting, Uribe informed Juan and Lagrotteria that he was having trouble locating 500 kilograms of cocaine. Juan responded that, to make the conspiracy worth the risks involved, they needed to import at least 500 kilograms of cocaine, and he suggested that the conspirators try to locate and pool together smaller quantities of cocaine in order to amass a large quantity. When asked at trial why Juan required such a large amount of cocaine, Uribe explained that Juan "told [him] many, many times that Jorge needed that quantity -- Jorge Reyeros, his brother, needed that quantity. He wouldn't work with other quantities, two or three hundred, or a hundred, it wasn't any good for him." (Supplemental Appendix ["SA"] 3145.) When asked what he meant when he said that Jorge wouldn't "work with" smaller quantities, Uribe testified, "It means that he wouldn't take little amounts of drugs to use his Customs

position, it would be too little of a deal.  He needed big deals.  Big drug deals."  (*Id.*)

Uribe also testified that, instead of shipping cocaine directly from Colombia to the United States, the conspirators planned to ship the drugs through Ecuador, concealed in a cargo container purportedly holding bananas.  According to Uribe, Juan explained that the container of drugs should be shipped from Ecuador instead of Colombia because Jorge had said it was "impossible to take anything out of Colombia." (SA 3176.)  Uribe further testified that the conspirators planned to elude detection by shipping multiple containers at one time, only one of which would contain drugs.   Uribe stated that Jorge was going to ensure that Customs would inspect only the containers that did not contain drugs and would let the container with the drugs "go by."  (SA 3148.) The conspirators never actually carried out their plan, however, because they were not able to acquire cocaine.

The jury found Jorge and Juan guilty of the charges alleged in Counts 5 and 6 of the Indictment.  It also specifically found, through special interrogatories, that Jorge and Juan had conspired to import more than 150 kilograms of cocaine and that Jorge had unlawfully accessed the Customs computer database in furtherance of the conspiracy.  The jury acquitted Jorge of the charges alleged in Counts 1 through 4.

After trial, Jorge and Juan each moved for a judgment of acquittal on Counts 5 and 6.  In addition, each moved for a new trial on a number of grounds, including erroneous evidentiary rulings, violations of the disclosure obligations imposed by *Brady*,[7] and prosecutorial misconduct during

---

[7]During trial, the defendants sought and were denied information that they contended was covered by the Jencks Act.

closing arguments.  The District Court denied the defendants' post-trial motions, and, on January 26, 2006, sentenced Jorge to 292 months in prison and Juan to 235 months in prison.

On appeal, Jorge and Juan challenge their convictions and Juan challenges his sentence.  We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## II.    Discussion

### A.    Sufficiency of the evidence

Jorge argues that, because the evidence presented at trial was insufficient to permit the jury to find him guilty beyond a reasonable doubt, the District Court erroneously denied his motion for a judgment of acquittal on Counts 5 and 6.  As noted earlier, Count 5 charged Jorge, Juan, Uribe, and Garravito-Garcia with conspiring to import cocaine, in violation of 21 U.S.C. § 963,[8] and Count 6 charged them with exceeding authorized access in furtherance of the conspiracy to import cocaine, and aiding and abetting exceeding authorized access, in violation of 18 U.S.C. §§ 1030(a)(2)(B), (c)(2)(B) and 2.[9]  Jorge's challenge to the sufficiency of the

---

[8]Section 952 of Title 21 prohibits the importation of a controlled substance into the United States, and § 960 of that title sets forth the penalties for importing a controlled substance in violation of § 952.  Section 963 of Title 21 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

[9] Section 1030(a)(2)(B) of Title 18 prohibits exceeding authorized access of a computer and thereby obtaining

10

evidence is a narrow one: he argues that his convictions must be vacated because the government failed to introduce sufficient evidence to establish that he knew that the specific object of the conspiracy was to import cocaine.[10]  We disagree.

In reviewing a challenge to the sufficiency of the evidence, we apply a "particularly deferential" standard of review.  *United States v. Cothran*, 286 F.3d 173, 175 (3d Cir. 2002) (quoting *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998)).  We do not weigh the evidence or decide the credibility of the witnesses.  *Id.*  Instead, "[w]e must view the evidence in the light most favorable to the Government and sustain the verdict if any rational juror could have found the elements of the crime beyond a reasonable doubt."  *Id.*

"One of the requisite elements the government must show in a conspiracy case is that the alleged conspirators shared a 'unity of purpose', the intent to achieve a common

---

information from a United States agency, and § 1030(c)(2)(B) provides an enhanced maximum penalty for violations of subsection (a)(2), "if ... the offense was committed in furtherance of any criminal or tortious act in violation of the Constitution or laws of the United States ... ."  The Indictment alleged that Jorge's violation of § 1030(a)(2) was committed in furtherance of the conspiracy to import cocaine alleged in Count 5.

[10] Jorge argues that if we vacate his conviction for conspiring in violation of 21 U.S.C. § 963 (Count 5), his conviction for exceeding unauthorized access of a Customs computer in violation of 18 U.S.C. § 1030 (Count 6) must also be vacated.  The government does not address that argument.  And, in light of our decision to affirm Jorge's conspiracy conviction, we will not address it either.

goal, and an agreement to work together toward the goal." *United States v. Wexler*, 838 F.2d 88, 90 (3d Cir. 1988) (citing *United States v. Kates*, 508 F.2d 308, 310-11 (3d Cir. 1975)). Accordingly, "[i]n order for us to sustain a defendant's conviction for conspiracy, the government must have put forth evidence 'tending to prove that defendant entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment.'" *United States v. Idowu*, 157 F.3d 265, 268 (3d Cir. 1998) (quoting *Wexler*, 838 F.2d at 91).

Jorge acknowledges that the evidence presented by the government is sufficient to support a finding that he accessed the Customs computer database for an improper reason. It is a concession practically compelled by the evidence. Jorge researched the importation and inspection records of the fictitious TJ Import Produce within a few days of Lagrotteria telling Garravito-Garcia that he had identified that company as a potential vehicle for importing cocaine. After Jorge accessed those records, Uribe informed Lagrotteria that TJ Import Produce had been investigated by his contact in Customs and was an acceptable recipient of the to-be-smuggled cocaine. The evidence is thus damning enough that, when viewed in the light most favorable to the government, it is more than sufficient to support a finding that Jorge knew the purpose of the conspiracy was to import some form of contraband. *Cf. United States v. Iafelice*, 978 F.2d 92, 97 n.3 (3d Cir. 1992) ("There is no requirement ... that the inference drawn by the jury be the only inference possible or that the government's evidence foreclose every possible innocent explanation."). That finding is further supported by Uribe's testimony that the conspirators planned to ship the container full of drugs from Ecuador instead of Colombia because Juan relayed that Jorge had said it was "impossible to take anything out of Colombia." (SA 3176.)

12

Perhaps recognizing that the evidence supports the conclusion that he knew he was involved in a conspiracy to bring something illegal into the country, Jorge argues on appeal that the record fails to show he knew the specific purpose of the conspiracy was to import cocaine, rather than some other form of contraband. To support his argument, Jorge cites a number of cases in which we reversed drug possession and distribution conspiracy convictions for lack of evidence that the defendant knew the purpose of the conspiracy involved drugs. *See, e.g.*, *United States v. Cartwright*, 359 F.3d 281, 286-90 (3d Cir. 2004); *Idowu*, 157 F.3d at 268-70; *United States v. Thomas*, 114 F.3d 403, 405-06 (3d Cir. 1997); *United States v. Salmon*, 944 F.2d 1106, 1113-15 (3d Cir. 1991); *Wexler*, 838 F.2d at 91-92. For example, Jorge relies on *Wexler*, in which we held that evidence sufficient to support a finding that a defendant acted as a lookout for a drug transaction was nevertheless insufficient to support a finding that the defendant was aware that drugs were involved in the transaction. *Wexler*, 838 F.2d at 91-92. Although we noted in that case that it was "more likely than not that [the defendant] suspected, if not actually knew, that some form of contraband was involved" in the transaction for which he acted as a lookout, we concluded that the record lacked any evidence from which the jury could reasonably infer that the defendant knew that the contraband involved was drugs. *Id.* at 92. There, we reasoned that the evidence was "just as consistent ... with a conspiracy to transport stolen goods, an entirely different crime." *Id.*; *see also Idowu*, 157 F.3d at 266-67 ("[E]ven in situations where the defendant knew that he was engaged in illicit activity, and knew that 'some form of contraband' was involved in the scheme in which he was participating, the government is obliged to prove beyond a reasonable doubt that the defendant had knowledge of the particular illegal objective contemplated by the conspiracy.").

In this case, however, unlike in *Wexler* and the other cases cited by Jorge, there is no evidentiary deficiency. Here, the government offered evidence showing that Jorge knew full well that the purpose of the conspiracy was to import a massive amount of cocaine. Uribe testified that, at an April 1999 meeting with Lagrotteria and Juan, he told them he was having trouble locating 500 kilograms of cocaine. According to Uribe, Juan insisted that they needed to import at least that much because, as Uribe elaborated, Juan said "many, many times that Jorge needed that quantity -- Jorge Reyeros, his brother, needed that quantity. He wouldn't work with other quantities, two or three hundred, or a hundred, it wasn't any good for him."[11] (SA 3145.) As earlier noted, when asked what was meant by saying that Jorge wouldn't "work with" smaller quantities of cocaine, Uribe testified, "It means that he wouldn't take little amounts of drugs to use his Customs position, it would be too little of a deal. He needed big deals. Big drug deals." (*Id.*) That testimony is sufficient to allow a rational juror to conclude beyond a reasonable doubt that Jorge was aware that the purpose of the conspiracy was to import cocaine, as opposed to some other form of

---

[11]In context, the plain implication is that Jorge was speaking not only about some controlled substance but specifically about cocaine, and the jury specifically found that object of the conspiracy was to import cocaine.

14

contraband.[12]  We therefore reject Jorge's challenge to the sufficiency of the evidence.

## B.  *Brady* and Jencks

Next, the defendants contend that the District Court erred in failing to order the prosecution to turn over documents filed with Colombian authorities by Uribe as he opposed his extradition to the United States.  The defendants acknowledge that, at the time of the trial, the documents they sought were not, and had never been, in the actual possession of the United States government.  The District Court held that, under the circumstances, the United States government was not obligated to obtain and produce documents that the government had never seen and that were in the possession of a foreign sovereign.  We agree with that ruling.

Uribe was first named as a defendant in this case in a superseding indictment returned by the grand jury on June 28, 2001.[13]  Counts 5 and 6 of the first superseding indictment

---

[12]Other evidence supports that conclusion as well.  For example, a jury could reasonably infer that Jorge would ask his own brother, Juan, the nature of the contraband for which he was putting his Customs career at risk.  In addition, Lagrotteria testified that Jorge was to receive a percentage of the value of any cocaine imported, which suggests that Jorge would want to know the nature of the contraband so that he could understand the expected payoff.  Those pieces of evidence buttress the direct statement of knowledge attributed to Jorge by his brother Juan.

[13]The original indictment was returned by the grand jury on December 21, 2000, and it charged Jorge and Juan with a single count of conspiring to exceed unauthorized access to a Customs computer database.

15

charged Jorge, Juan, Uribe, and Garravito-Garcia with conspiracy to import cocaine, attempting to exceed authorized access to a Customs computer, and aiding and abetting the attempt to exceed authorized access.  When the first superseding indictment was returned in 2001, Uribe was, as we have noted, in a Colombian prison serving a sentence for drug trafficking and conspiracy.  While investigating this case, the United States sought to question Uribe.  To that end, it sent to the government of Colombia a document entitled, "Vienna Convention Mutual Legal Assistance Request."  (SA 3753.)  The request asked Colombian authorities to interview Uribe using questions provided by the United States and then to provide a written summary of Uribe's responses.  But instead of questioning Uribe and providing his answers to the United States, Colombian authorities permitted United States Customs investigators to personally interview Uribe in Colombia.

That interview took place over the course of two days on November 19 and 20, 2002 and was memorialized by Customs investigators in a written report.[14]  The report indicates that, before the interview, Maria Cristina Munoz, a Colombian prosecutor, read to Uribe and his attorney the questions contained in the United States' Mutual Legal Assistance Request in the presence of the Customs investigators and Carmen Colon, a United States Department of Justice Judicial Attache.  After Munoz finished reading the questions, Munoz and Colon left the room and the Customs investigators interviewed Uribe.

Following the interview, the United States asked Colombia to extradite Uribe to face the charges in Counts 5 and 6 of the first superseding indictment.  Uribe opposed

---

[14]The prosecution produced a copy of that report to the defense during the trial.

extradition but failed to prevent it; he arrived in the United States on December 13, 2004, after the grand jury returned the second superseding indictment, and after the trial of Jorge and Juan had begun. The same day Uribe arrived, he entered into a plea agreement which provided that he cooperate with the United States government and plead guilty to conspiracy to import cocaine into the United States. The next day, he pled guilty in accordance with the agreement, and, two days after that, he testified on behalf of the government at the trial of Jorge and Juan.

When it became apparent that Uribe was coming to the United States and would testify, the defendants asked the District Court to compel the prosecution to obtain and produce, among other things, any documents Uribe had filed with Colombian authorities to oppose his extradition. The defendants contended that, even if the prosecution did not actually possess such documents, it had a duty under *Brady v. Maryland*, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500, to acquire them. The essence of the defendants' argument was that the prosecution constructively possessed any documents possessed by the Colombian authorities relating to Uribe's extradition because Colombia had cooperated with the United States both by permitting United States officials to interview Uribe and by acting upon the United States' request to extradite him.

On December 14, 2004, during the trial, the District Court held a hearing to consider the defendants' discovery demands. At the hearing, the government took the position that it had no obligation to obtain and turn over the documents sought by the defense. Nevertheless, the prosecutor represented that the United States was attempting to obtain documents from Uribe's attorney in Colombia and that it would turn over whatever it obtained. As earlier noted, the District Court denied the discovery demands. It ruled that the

17

prosecution was not in actual or constructive possession of the documents sought by the defense and was therefore not required under *Brady* or the Jencks Act to obtain and produce them.[15]  The defendants wrongly say that was error.

*Brady* stands for the proposition that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  A *Brady* violation has three components: the evidence at issue must be favorable to the defendant; it must be material; and it must have been suppressed by the prosecution.  *United States v. Pelullo*, 399 F.3d 197, 209 (3d Cir. 2005); *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).  Material evidence can include evidence that may be used to impeach a witness.  *Id.* at 676; *Giglio v. United States*, 405 U.S. 150, 154 (1972).

*Brady* prohibits the prosecution from "supress[ing]" material, favorable evidence, 373 U.S. at 187, but that does not mean that the prosecution's duty to disclose is limited to evidence within the actual knowledge or possession of the prosecutor.  It is well-settled that the prosecution has a duty to learn of and disclose information "known to the others acting on the government's behalf in the case ... ." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  Accordingly, it has been held that a state prosecutor has a duty to obtain and turn over to the defense favorable evidence known to a state police officer

---

[15]Despite the District Court's ruling, it appears that the prosecution did obtain some documents from Uribe's attorney and did turn them over to the defense.

18

who investigated the case.  *Id.* at 437-38.  Similarly, a federal prosecutor is charged with knowledge of information possessed by other agents of the federal government when those agents are a part of a "prosecution team," which includes federal personnel involved in the investigation as well as the prosecution of a case.  *Pellulo*, 399 F.3d at 216-18; *see also United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979) ("[T]his Court has declined to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel.").

In some cases, the government's obligations under *Brady* may extend even further.  We have held that, under certain circumstances, evidence possessed by state agents may be constructively possessed by a federal prosecutor such that the prosecutor has a duty to obtain that evidence and disclose it to the defense.  *See United States v. Risha*, 445 F.3d 298, 303-06 (3d Cir. 2006); *see also Antone*, 603 F.2d at 569-70. In *Risha*, we called this issue "cross-jurisdiction constructive knowledge."  *Risha*, 445 F.3d at 299.  We considered in that case whether it was proper to impute to a federal prosecutor the knowledge of state agents that a witness who had testified in a federal criminal case expected leniency with respect to unrelated state charges, in return for his cooperation in the federal case.  *Id.*  Although the federal prosecutor did not know that the witness expected leniency in state court in return for his testimony, we concluded that the federal prosecutor might, under certain circumstances, be deemed to have constructive knowledge of that information if it was known to the state agents.  *Id.* at 306.

We held that a case-by-case analysis was appropriate when considering a federal prosecutor's constructive knowledge, and we set forth three questions as relevant to the analysis: "(1) whether the party with knowledge of the

information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence." *Id.* at 304. The first question concerns the "intermingling" of the forces of the federal government with the forces of the state sovereign.[16] *Id.* The second question is closely related to the first and asks whether the federal government and the state "are part of a team or are engaged in a joint effort" or whether they had a "close working relationship." *Id*. at 305. The last question considers whether the information the defense alleges should have been disclosed was available to the prosecution if it had sought to discover it. *Id.* In *Risha*, we opined that facts indicating that a state agent was heavily involved in the prosecution and knew of impeachment evidence would support a conclusion that federal prosecutors had constructive knowledge of that evidence. *Id*. at 306.

Our holding in *Risha* relied, in part, on the opinion of the United States Court of Appeals for the Fifth Circuit in *United States v. Antone*. In that case, the Fifth Circuit considered whether knowledge of state investigative agents should be imputed to federal prosecutors where there was a joint investigative task force composed of FBI agents and

---

[16]Implied though not stated in this inquiry into "intermingling" is the idea that the federal government would be the controlling entity in a federal-state partnership. Whether that is a sound assumption in all cases is open to debate. If the *Risha* test were applicable in the context of cooperation between the United States and a foreign sovereign, a proposition not without doubt (*see infra*), simply showing an "intermingling" of assets would clearly not be sufficient to show the control assumed in *Risha*.

20

state agents.  *Antone*, 603 F.2d at 568-69.  The defendants argued that evidence that a witness's attorney fees had been paid by the state was material because it could have been used to impeach the witness, and they argued further that the state agents' knowledge of that evidence should be imputed to the federal prosecutors for purposes of determining whether the evidence had been suppressed in violation of *Brady*.  *Id.* at 569-70.

The Fifth Circuit agreed that the state agent's knowledge should be imputed to federal prosecutors.  The Court first noted that, if the investigators with knowledge of the evidence had worked for a federal agency, their knowledge would have been imputed to the prosecution for *Brady* purposes.  *Id*. at 569.  The Court went on to consider whether evidence in the possession of the state investigators should be treated differently because those investigators represented a different sovereign.  Instead of imposing a "rigid distinction" between knowledge possessed by the federal and state agencies, the court endorsed a "case-by-case analysis of the extent of interaction and cooperation between the two governments." *Id*. at 570.  The Fifth Circuit ultimately concluded that the knowledge of the state investigators should be imputed to the federal prosecutors in that case because the federal and state investigative agencies had "cooperated intimately from the outset of [the] investigation" and the degree of cooperation was "extensive." *Id.*  According to the Court, the state investigators essentially "functioned as agents of the federal government under the principles of agency law" and "were in a real sense members of the prosecutorial team." *Id.*

The situation in the present case is markedly different.  First, and most obviously, it involves a foreign sovereign, which implicates issues that may well make a showing of effective federal control of foreign evidence more sensitive

and demanding than is suggested by the *Risha* factors. But even if *Risha* were the operative test, the defendants do not meet that less demanding standard.[17] The first *Risha* factor–whether the individuals with possession of the requested information were acting on the federal government's "behalf" or were under its "control"–does not support a determination of constructive possession in this case. *Risha*, 445 F.3d at 304. There is nothing of record to indicate that the nation of Colombia was somehow under American control in the investigation of this case, or that any Colombian authorities were members of a United States "prosecution team." Unlike the state agents in *Antone*, Colombian authorities did not function as agents of the United States government. It is true that the Colombian government acted at the request of the prosecution in permitting the federal investigators to interview Uribe; however, beyond the initial recitation of the officially propounded questions, no Colombian officials participated in that interview or any other part of the investigation. Moreover, while Colombian officials naturally participated in the Colombian judicial proceeding that resulted in Uribe's extradition, those authorities did not function as agents of the United States government or act under its control. Instead, they acted on behalf of their own government in responding to a request from the United States. The level of cooperation extended by the Colombian government, while admirable, appears to have been nothing more than the comity called for by treaty and custom. We decline to adopt the defendants' suggestion that a determination of constructive possession is appropriate

---

[17]We assume, for purposes of discussion only, that the evidence sought by the defendants was both favorable to the defense and material, focusing instead on *Brady*'s requirement that the evidence must have been in the possession of the prosecution.

whenever a foreign government responds to a request from the United States for investigative or judicial assistance.

Nor does the second *Risha* factor support a determination of constructive possession. There was no joint investigation by the United States and Colombian governments regarding the events alleged in the Indictment. Indeed, there is no indication that the two governments shared any investigative resources whatsoever.[18] *See*

_____

[18]The defendants point to a document that, they say, suggests there was a joint investigation. The document is a letter sent by Uribe in July 2004 to a Colombian Magistrate, in which Uribe states that Maria Cristina Munoz, a Colombian prosecutor, informed him in 2001 that United States Customs agents wanted to interview him. In the letter, Uribe states that he "spontaneously" told Munoz what he knew about the conspiracy now at issue. (Joint Appendix 456.) The defendants seem to contend that that letter establishes the existence of a joint investigation between the United States and Colombia.

It is questionable whether the defendants' argument with respect to Uribe's July 2004 letter is properly put to us at all since it does not appear to have been presented to the District Court. In any event, the fact that Uribe spoke to a Colombian prosecutor regarding the events alleged in the Indictment does not indicate the existence of a joint investigation. The relevant question, again, is not whether a Colombian official may have learned of evidence relevant to this case, but whether the Colombian government was engaged in a cooperative investigation with the United States government. Uribe's letter does not suggest that it was. No more persuasive is the defendants' contention that a joint investigation is shown by evidence that Carmen Colon, a United States Department of Justice Judicial Attache, contacted Uribe's Colombian attorney regarding the United

23

States' desire to secure Uribe's testimony. The defendants have not explained how evidence of communications between an agent of the United States government and Uribe's attorney demonstrates that there was a joint investigation between the United States and the government of Colombia.

The defendants' briefs also refer to a document that they claim to have recovered after trial from a Colombian court extradition file. That document appears to be a letter sent by Uribe to the Attorney General of Colombia in May 2004 and is strikingly similar to Uribe's July 2004 letter to the Colombian Magistrate. Moreover, the May 2004 letter was never presented to the District Court and is not properly part of the record on appeal. Fed. R. App. P. 10(a).

Despite the lack of evidence indicating a joint investigation, the defendants argue that the District Court should have held an evidentiary hearing regarding their contention that the United States and Colombia undertook such an investigation. However, as just indicated, the defendants did not provide any good cause for a hearing. Put simply, they have failed, both before the District Court and on appeal, to articulate how an evidentiary hearing would have helped them establish that there was a joint investigation. Because they did not make a threshold showing that a material fact was in dispute, their demand for an evidentiary hearing warranted no more consideration than the District Court gave it. *Cf. United States v. Panitz*, 907 F.2d 1267, 1273 (1st Cir. 1990) ("The test for granting an evidentiary hearing in a criminal case [is] substantive: did the defendant make a sufficient threshold showing that material facts were in doubt or dispute?"); *Gov't of Virgin Islands v. Martinez*, 780 F.2d 302, 306-08 (3d Cir. 1986) (holding that an evidentiary hearing regarding an alleged *Brady* violation was appropriate when an affidavit submitted by the defendant to the district court raised "genuine issues of material fact") (quoting *United States v. Dansker*, 565 F.2d 1262, 1264 (3d

24

*Moon v. Head*, 285 F.3d 1301, 1310 (11th Cir. 2002) (refusing to impute to a Georgia state prosecutor evidence possessed by Tennessee law enforcement officials when there was no evidence that Tennessee officials and Georgia prosecutors had participated in a joint investigation).

Finally, the third *Risha* factor–whether the federal government had "ready access" to the sought-after information–does not support a determination of constructive possession. *Risha*, 445 F.3d at 304. The record suggests that the prosecution did not have access to the documents in Uribe's Colombian court file, aside from those documents it was able to obtain from Uribe's attorney in Colombia. *Cf. United States v. Hughes*, 211 F.3d 676, 688 (1st Cir. 2000) (holding that the prosecution was not required to produce crime scene photographs in the possession of the Mexican government because "the government has no duty to produce evidence outside of its control"); *United States v. Friedman*, 593 F.2d 109, 120 (9th Cir. 1979) (holding that *Brady* did not require evidence seized by the Chilean government to be produced when the federal government had no access to the evidence). More importantly, though, we could not conclude that the prosecution had constructive possession of the requested documents in this case even if it could have acquired them. The mere fact that documents may be obtainable is insufficient to establish constructive possession. Without a showing that evidence is possessed by people engaged in the investigation or prosecution of the case, we have declined to hold that the evidence was constructively possessed by federal prosecutors, despite its being in the possession of another agent of the federal government and

---

Cir. 1977)).

25

therefore presumably obtainable.[19] *See, e.g., Pelullo*, 399 F.3d at 218 (holding that information known to officials in the United States Department of Labor was not constructively known to federal prosecutors when there was no indication that the prosecution and the officials engaged in a joint investigation or that the prosecution had any control over the officials); *United States v. Merlino*, 349 F.3d 144, 154 (3d Cir. 2003) (holding that there is no "duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue") (quoting *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996)).

In sum, after examining the factors set forth in *Risha*, we conclude that the United States was not in constructive possession of evidence, if there were any, possessed by Colombian authorities, and thus there was no violation of *Brady* in this case.

We also reject the defendants' argument that the prosecution was obligated by the Jencks Act to turn over documents filed by Uribe in Colombia in opposition to his extradition. Jencks requires the prosecution to produce a witness statement "in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). We have held that the phrase "in the possession of the United States" should be read to "require production only of statements possessed by the prosecutorial arm of the federal government." *Merlino*, 349 F.3d at 155 (quoting *United States v. Dansker*, 537 F.2d 40, 61 (3d Cir. 1976)); *see also United States v. Weaver*, 267 F.3d 231, 245 (3d Cir. 2001) ("[T]he Jencks Act only applies to evidence in the possession of the United States, and not state

---

[19]This, of course, assumes that the exculpatory information in question was not known to the prosecutors.

26

authorities ... ."); *Friedman*, 593 F.2d at 120 (holding that the Jencks Act did not require the production of evidence that had been seized by the Chilean government). In this case, the documents sought were allegedly located in Uribe's Colombian court file. We reject any general assertion, and certainly any assertion on this record, that Colombian courts serve as an arm of the United States government.[20] Therefore, we also reject the defendants' argument that the prosecution was required to obtain and turn over those documents under the Jencks Act.[21]

_____

[20] We recognize the existence of authority from the United States Court of Appeals for the Second Circuit that suggests the United States might have a duty under the Jencks Act to attempt to obtain and produce written statements that are in the actual possession of another sovereign when the two governments have engaged in a joint investigation. *See United States v. Paternina-Vergara*, 749 F.2d 993, 998 (2d Cir. 1984) (holding that the most the Jencks Act requires when there is a joint investigation is "a good-faith effort to obtain the statements of prosecution witnesses in the possession of the foreign government" and concluding that the prosecution in that case had made such an effort). We need not address that issue today, however, because, as explained above, there was no joint investigation in this case. *Cf. United States v. Durham*, 941 F.2d 858, 860-61 (9th Cir. 1991) (holding that a federal prosecutor had no obligation under the Jencks Act to provide written statements in the possession of a state agency, noting that federal and state agencies had not undertaken a joint investigation in that case).

[21] The defendants contend that the prosecution committed a number of other *Brady* violations unrelated to the alleged suppression of evidence in the possession of Colombian authorities. As those additional arguments are vague, conclusory, and, ultimately, unpersuasive, we address them

### C.   Other challenges to the convictions

Jorge and Juan raise a number of other issues related to their convictions, none of which, either alone or in combination, warrant a new trial.  First, Juan challenges the District Court's decision to deny his motion for severance. We review under an abuse-of-discretion standard a district court's decision not to sever defendants.  *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993).  Even if a district court abuses its discretion, however, reversal is not required absent a demonstration of "clear and substantial prejudice resulting in a manifestly unfair trial."  *United States v. Hart*, 273 F.3d 363, 370 (3d Cir. 2001) (internal quotation marks omitted).

Federal Rule of Criminal Procedure 8(b) states that defendants may be charged together in an indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  It further provides that "[a]ll defendants need not be charged in each count."  *Id.*  Rule 14(a), in turn, permits a court to sever defendants' trials if the joinder of defendants in an indictment "appears to prejudice a defendant."  Fed. R. Crim. P. 14(a). "[W]hen defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro*, 506 U.S. at 539.

Juan does not contend that he and Jorge were improperly charged together in the Indictment.  Instead, he appears to argue that the District Court abused its discretion in declining to sever his trial from Jorge's because evidence of

no further.

28

the separate conspiracy alleged in Counts 1 through 4, counts which name only Jorge as a defendant, had the potential to lead a jury to conclude Juan was involved in that conspiracy and thus to unfairly lead the jury to find Juan guilty on Counts 5 and 6.[22] Juan further argues that the joint trial subjected him to actual prejudice, not only because the jury heard evidence that was only relevant to Counts 1 through 4, but also because the prosecutor confused Jorge's and Juan's names on multiple occasions.

In denying Juan's motion to sever, the District Court concluded that any potential prejudice to Juan resulting from the joint trial could be cured by limiting instructions, which the District Court gave. We agree. The risk of unfair prejudice in this case was not such that the District Court was bound to grant Juan's motion to sever. *Cf. Zafiro*, 506 U.S. at 540 ("[E]ven if there were some risk of prejudice, here it is of the type that can be cured with proper instructions, and 'juries are presumed to follow their instructions.'") (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

However, even if we agreed with Juan that the District Court abused its discretion in denying his motion to sever, he has failed to demonstrate "clear and substantial prejudice resulting in a manifestly unfair trial." *Hart*, 273 F.3d at 370 (internal quotation marks omitted). There is no reason to believe that the jury failed to understand the District Court's instructions regarding how to use the evidence offered against

---

[22]Portions of Juan's brief appear to suggest that the District Court should have granted his motion for severance not because the joint trial created a risk of prejudice but because of what actually developed during trial. But, of course, the question of whether the District Court abused its discretion in denying his motion for severance should be judged as of the time the motion was ruled on.

Jorge on Counts 1 through 4. Moreover, although "evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty," *Zafiro*, 506 U.S. at 539, Juan's assertion that the jury so erred in this case has no force, given the jury's acquittal of Jorge on Counts 1 through 4. Finally, although it appears that the prosecutor mixed up Jorge's and Juan's names on more than one occasion, the trial transcript indicates that, on each occasion, the prosecutor either corrected himself or was corrected by the Court. After examining the record, we are unpersuaded that Juan suffered any prejudice, let alone clear and substantial prejudice, by being tried with his brother, and we therefore reject his challenge to the District Court's denial of his motion to sever.

Next, the defendants allege that many of the District Court's evidentiary rulings constituted abuses of discretion. These complaints truly warrant little comment. Suffice it to say that, having examined the record, we see no abuse of discretion in the experienced District Judge's even-handed rulings on evidentiary questions.[23] We also reject Juan's assertion that the District Court abused its discretion in failing

_____

[23]The defendants' argument that the District Court improperly admitted testimony regarding a phone conversation between Juan and Lagrotteria lacks merit because the record reflects that the Court struck that testimony and instructed the jury not to consider it. For the same reason, there is nothing to the defendants' argument that the District Court erroneously admitted testimony from Uribe that the jury might have understood to refer to prior drug deals by the defendants. Finally, we cannot conclude that District Court abused its discretion in admitting Lagrotteria's testimony regarding the amount of profit his co-conspirators told him he could expect to receive for his participation in the conspiracy.

to grant a mistrial after Lagrotteria testified regarding an unrecorded phone conversation he had with Juan, during which Juan was "clowning around" and told Lagrotteria that Juan had a gun to Uribe's head. (SA 594.) The District Court immediately struck that portion of Lagrotteria's testimony and instructed the jury to disregard it. Assuming, without deciding, that the challenged testimony was inadmissible, we believe that the Court's instruction was more than sufficient to cure any unfair prejudice.

In addition, we reject the defendants' argument that the District Court abused its discretion in failing to grant a mistrial as a result of alleged prosecutorial misconduct during closing arguments. Again, we are unpersuaded that the challenged comments, assuming they were improper, affected the jury's ability to judge the evidence fairly.

Finally, we decline the invitation to aggregate these alleged errors and then conclude the defendants were deprived of a fair trial. Even when all of the defendants' complaints are combined, the District Court's handing of this highly contentious case was admirable, not error-ridden.

### D.    Sentencing

We turn last to Juan's challenge to his sentence. He argues that he should be re-sentenced because, prior to his sentencing, the District Judge spoke with Uribe off the record. The record in this regard is less than clear but it does appear that the District Judge did speak with Uribe before sentencing and that their discussion was outside of the presence of the parties and was not transcribed. We are nevertheless compelled to conclude that Juan waived any objection he might otherwise have had regarding that discussion.

31

Prior to sentencing, the defendants moved for downward departures under the advisory Guidelines. The government opposed the motions and offered to put Uribe on the stand at the sentencing hearing to provide a factual rebuttal to the defendants' contentions. The government requested, however, that the District Court limit the defendants' cross-examination regarding the identity of one of Uribe's cocaine suppliers because Uribe believed he would be in mortal danger if he openly named the supplier. The defendants objected to any limitation being placed upon Uribe's cross-examination, but Juan's counsel expressly affirmed he had no objection to the sensitive portion of Uribe's testimony being taken "*in camera*."[24] (SA 3816.)

On the morning of the sentencing hearing, counsel for both sides spoke with the District Judge in chambers prior to the hearing. That conference was not placed on the record. Later, at the beginning of the sentencing hearing, the District Judge noted that the defendants had agreed during the off-the-record conference to withdraw their motions for downward departures and that, as a result, the government was no longer seeking to introduce Uribe's testimony at the sentencing hearing. The government still offered to have Uribe testify, if the District Judge believed such testimony would be relevant in determining the appropriate sentences to impose. The Judge indicated, however, that he did not need to hear from Uribe, that Uribe's testimony would only have been relevant to the defense motions for downward departure, which had been withdrawn. The Court proceeded to sentencing without further discussion on that point.

---

[24]It's unclear what the parties understood *"in camera"* to mean. Statements by the prosecution indicate that it contemplated the defendants being present during the portion of Uribe's cross-examination that was to be taken *in camera*.

After the Court had imposed sentence, counsel for Juan stated, "I forgot earlier after the ex parte meeting with Mr. Uribe to register my objection." (SA 3713.) The following exchange then took place, in which the District Court understandably displayed its consternation:

> THE COURT: That's very fine, but I don't recall that ever being indicated to me before I engaged in this exercise. I didn't hear any objection from anybody.
>
> ...
>
> What are you saying to me?
>
> [JUAN'S COUNSEL]: That we did not have an opportunity on the record to object to the ex parte proceeding.
>
> THE COURT: Where have you been? I came out here a number of times before I began the sentencing and I never heard anything about this. In fact, I kept Uribe here in the event there would be a problem about my decision or your decision to not proceed with the motion to depart.
>
> [JORGE'S COUNSEL]: Your Honor advised us, me and advised [another of Juan's counsel] and myself and [Juan's counsel] had an opportunity to

33

object had we so determined.  So I absent myself from --

THE COURT: I appreciate that.  I try to bend over backwards to make this a fair proceeding.  I really do.

[JORGE'S COUNSEL]: No question about that.

...

THE COURT: ... You [Juan's counsel] made the objection for the record.  Let me make something for the record.

You know, every time I do this I regret it.  It's only happened to me one time before. ...

Every time, at counsel[']s request, Judge can we see you in chambers before you come out?  I thought to myself well, you know, these are respected attorneys.  I rely on what they say.  I don't have any problem discussing preliminarily something that's of concern to them.  So, I didn't have a Court Reporter in there which reflects my trust in counsel.  And then to come out here now and have defense counsel tell me that

they object to my ex parte proceeding. In fact --

[JORGE'S COUNSEL]: Not me.

THE COURT: I recognize it's [Juan's counsel].

In fact, in chambers off the record I think I originally said government counsel will conduct the [sic] examinaiton. Then I said to myself well, that doesn't make any sense. Why should I have government counsel in here with defense counsel in here. So, I'll talk to the witness, Mr. Uribe, myself with no counsel present. I never heard a single objection about that. ...

(SA 3713-15.)

On appeal, Juan alleges that the District Judge may have improperly relied on information he obtained by Uribe during their private discussion in deciding upon the sentence to impose. He requests that we vacate Juan's sentence and remand for re-sentencing before a different judge. Although the precise basis for his assertion of error is not entirely clear, he appears to contend that the conversation between Uribe and the District Judge violated his right to due process because any comment Uribe might have made was untested and unreliable.

35

After examining the transcript of the sentencing proceeding, we conclude that Juan waived whatever argument he might have had because he agreed to have the District Court speak with Uribe off the record and alone prior to the sentencing hearing.[25]  The transcript indicates that the Court explicitly gave all counsel, including counsel for both Jorge and Juan, an opportunity to structure how certain information relevant to the defendants' downward departure motions would be received from Uribe.  Counsel not only failed to object, they played a direct role in developing how the discussion with Uribe would take place.  Under those circumstances, the Judge understood–and it was entirely reasonable for him to understand–that Juan, through his counsel, had agreed to the Judge speaking with Uribe privately prior to the sentencing hearing.  *Cf. United States v. Mitchell*, 85 F.3d 800, 807-09 (1st Cir. 1996) (counsel's lack of objection coupled with behavior suggesting assent constituted a waiver).  We share the District Court's distress at gamesmanship so blatant that even counsel for Juan's brother distanced himself from it, and we hold that Juan's late objection was waived.[26]

---

[25]We note, however, that there is no indication from the transcript of the sentencing proceeding that, when deciding upon the sentences to impose, the District Judge relied in any way upon information he might have received from Uribe during their private discussion.

[26]We emphasize, though, that district courts should avoid off-the-record discussions with either counsel or witnesses.  As this case demonstrates, such a procedure may tempt a disappointed party to adopt dubious tactics to overturn a decision.  Although counsel's "I forgot to object" ploy is devoid of merit, it provides a cautionary tale.

## III.    Conclusion

For the reasons set forth above, we will affirm the District Court's judgments of conviction and sentence.