**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 18-3683 and 19-1173

_____

UNITED STATES OF AMERICA

v.

KAY ELLISON,
Appellant in No. 18-3683

_____

UNITED STATES OF AMERICA

v.

JUDY TULL,
Appellant in No. 19-1173

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-15-cr-00622)
District Judge: Honorable Susan D. Wigenton

_____

Submitted Under Third Circuit LAR 34.1(a)
January 22, 2020

Before: AMBRO, MATEY, and FUENTES, *Circuit Judges*.

(Opinion Filed:  February 12, 2020)

---

OPINION[*]

---

MATEY, *Circuit Judge.*

A jury convicted Kay Ellison and Judy Tull for violating the federal wire fraud, bank fraud, and conspiracy statutes. They challenge those verdicts with claims of prosecutorial misconduct and insufficient evidence, as well as violations of their right against self-incrimination. And they attack their sentences as unfair. But we find no error, and will affirm.

## I. BACKGROUND

Ellison and Tull co-founded a charter airline called Southern Sky Air & Tours d/b/a "Myrtle Beach Direct Air & Tours" ("Direct Air"), where they served as managing partners. Both were indicted for their role in a scheme to violate Department of Transportation ("DOT") regulations. The regulations require airlines to deposit customer payments into an escrow account and prohibit airlines from withdrawing those funds until the completion of the associated flights. 14 C.F.R. pt. 380. But rather than wait for the money, Ellison and Tull inflated the number of passengers on the flights with "dummy" listings. This allowed Defendants to send similarly inflated withdrawal requests to the bank. And to conceal this scheme, Defendants falsified the company's profit and loss statements. After discovering these acts, the Government charged both Tull and Ellison

---

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

with conspiracy to commit wire fraud and bank fraud in violation of 18 U.S.C. § 1349 (Count 1), wire fraud in violation of 18 U.S.C. §§ 1343 and 2 (Counts 2–5), and bank fraud in violation of 18 U.S.C. §§ 1344 and 2 (Counts 6–8). After trial, a jury found them both guilty on all counts. And along the way, Direct Air filed for bankruptcy.

Defendants then filed motions for acquittal or a new trial, all of which the District Court denied. So in preparation for sentencing, Ellison asked both the Government and the bankruptcy trustee for various documents she thought relevant to her arguments. Both eventually complied. But when Ellison received the trustee's production, she found documents she had sought earlier in the case, documents the Government claimed had been destroyed. That discovery prompted Defendants to file motions seeking both a new trial or a change to the loss calculation and enhancements in the Pre-Sentencing Report. The District Court denied those requests and sentenced both Ellison and Tull to ninety-four months' imprisonment and five years of supervised release, below the range suggested by the United States Sentencing Guidelines. These timely appeals followed.[1]

## II. DISCUSSION

We consider each error claimed by Ellison and Tull and, finding none have merit, we will affirm the District Court's rulings.

### A. There Was No Suppression of Favorable Material Evidence

Defendants argue that violations of *Brady v. Maryland* require us to set aside their convictions. 373 U.S. 83 (1963). To prevail, they must show that favorable material

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

3

evidence was "suppressed by the prosecution." *United States v. Reyeros*, 537 F.3d 270, 281 (3d Cir. 2008). Materiality requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* Their claims fall into two categories: 1) documents related to Direct Air's bankruptcy proceeding held by the trustee; and 2) documents the Government erroneously claimed were destroyed.[2] But neither set of documents would have likely affected the convictions.

First, Defendants highlight a handful of documents they argue could have been used to impeach "the Government's key witness, [Robert] Keilman." (Ellison Opening Br. at 18.) Keilman was Direct Air's Chief Financial Officer who pleaded guilty to conspiring with Ellison and Tull to commit wire fraud and then testified against them. Though some documents could have been used to attack his testimony, Defendants overstate the Government's reliance on Keilman. While the District Court opined that "Keilman's testimony . . . provides a sufficient basis upon which a rational juror could find beyond a reasonable doubt that Defendants conspired to commit bank and wire fraud," it also relied on at least two other witnesses. (App. at 21.) And those witnesses also "indicated that Tull and Ellison were engaged in activities designed to hide Direct Air's financial condition and improperly move money out of the escrow account." (App. at 21 n.7.) As the contested documents provide no meaningful grounds to challenge the testimony of these other

---

[2] Tull also argues that if there were no *Brady* violations, then she has an ineffective assistance claim against her counsel for not finding this evidence. But it is not "plain from the record" that her counsel acted unreasonably, so she must raise that claim in a collateral attack. *United States v. Headley*, 923 F.2d 1079, 1084 (3d Cir. 1991).

4

witnesses, there is ample inculpatory evidence and thus little likelihood a jury would have reached a different result.

**B.      No Prosecutorial Misconduct Occurred**

Defendants argue that the District Court abused its discretion in denying a new trial based on alleged prosecutorial misconduct. *See United States v. Liburd*, 607 F.3d 339, 342 (3d Cir. 2010). Prosecutorial misconduct violates due process where it has "so infected the trial with unfairness as to make the resulting conviction a denial of due process in light of the entire proceeding." *Id.* at 344. Defendants base their claim on "name-calling" during the trial, a serious allegation lacking serious support. They note the prosecutors used variations of the words "lie" and "steal" hundreds of times at trial. Indeed, they did. But that is not name-calling; it is "fair comment on the evidence adduced at trial" and not "an inflammatory expression of a prosecutor's personal belief." *United States v. Reilly*, 33 F.3d 1396, 1421 (3d Cir. 1994). The District Court properly found there was no prosecutorial misconduct, and for that reason did not abuse its discretion in denying a new trial.

**C.      There Is Sufficient Evidence to Find Wire and Bank Fraud**

Defendants allege that the jury verdicts regarding wire and bank fraud should be overturned for lack of evidence. *See United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987). Their argument is straightforward: the Government cannot distinguish the improperly withdrawn monies from those validly taken out of escrow. And as a result, they conclude, it cannot prove which withdrawals violated DOT regulations.

But the elements of all three charged offenses center on whether there was a scheme to defraud through false representations. Here, the evidence established that the escrow

5

release requests hinged on inflated passenger rosters. It also shows that Defendants were aware of the growing deficiency in the escrow account, and they took active steps to conceal Direct Air's financial condition. A rational jury could find that this shows that the escrow requests were part of a scheme to defraud, as those requests triggered the improper release of at least *some* funds. That is enough for both bank and wire fraud. *See United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010) (When reviewing a denied motion for acquittal, "we view the evidence in the light most favorable to the prosecution and sustain the verdict unless it is clear that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").

## D.  No Forced Self-Incrimination Through Reciprocal Discovery

Ellison argues her Fifth Amendment right against self-incrimination was violated when the District Court refused to amend its Discovery Order. She notes that, under Federal Rule of Criminal Procedure 16, the Government only enjoys the right to pretrial discovery from a criminal defendant if a defendant first asks for discovery. But here, Paragraph 1(h) of the District Court's Order explained that "[a] defendant who receives discovery pursuant to this Order shall be deemed to have requested such disclosure for the purpose of triggering defendant's reciprocal discovery obligations." (App. at 42.) This meant that Ellison had to provide reciprocal discovery after the Government's production, and without her prior request.

But there is no violation of the Fifth Amendment right against self-incrimination without some actual self-incrimination. The Discovery Order only required the Defendants to produce items they "intend[ed] to use . . . in [their] case-in-chief at trial." Fed. R. Crim.

6

P. 16(b)(1)(A)(ii). As Ellison would have used this evidence at trial regardless of the Order, all it did was "accelerate the timing of [the] disclosure." *Williams v. Florida*, 399 U.S. 78, 85 (1970). So the Order did not cause any self-incrimination and did not violate the Fifth Amendment.

**E.      Loss Calculation and Sentence**

1.      Ellison

Ellison argues a hearing was needed to resolve factual disputes about the amount of loss resulting from the scheme. An evidentiary hearing may be used to resolve fact questions affecting the "fashioning of an appropriate sentence." *United States v. Cifuentes*, 863 F.2d 1149, 1155 (3d Cir. 1988). But here the District Court relied on the Government's expert to calculate the loss. And at trial Ellison declined her chance to challenge the expert in court. Ellison had ample opportunity to explain her challenges to the expert's report. Thus, she was provided an "adequate opportunity to present relevant information." U.S. Sentencing Guidelines Manual § 6A1.3 cmt. (U.S. Sentencing Comm'n 2018). Under these facts, the District Court did not abuse its discretion when proceeding without a loss calculation hearing. *See United States v. Houston*, 217 F.3d 1204, 1206–07 (9th Cir. 2000); *cf. United States v. Styer*, 573 F.3d 151, 153–54 (3d Cir. 2009).

Ellison also contends that the District Court's loss calculation relied on a separate scheme not proved at trial. But loss calculations properly include all "reasonably foreseeable pecuniary harm that resulted from the offense." U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.3(A)(i) (U.S. Sentencing Comm'n 2018). It was relevant conduct because it was "part of the same . . . common scheme or plan as the offense of conviction,"

7

and thus reasonably foreseeable harm.[3] *Id.* § 1B1.3(a)(2). That factual finding can be overturned only for clear error. *See United States v. Napier*, 273 F.3d 276, 278 (3d Cir. 2001). Here, the District Court did not clearly err in its loss calculation in finding the two schemes formed a common plan.

2.      Tull

Tull argues that an enhancement for abuse-of-trust was erroneously applied. Tull was at least a former CEO of Direct Air and a high-ranking partner. She held a position of trust, which she used to falsify reports and request withdrawals. There was no error in applying the enhancement. *See* U.S. Sentencing Guidelines Manual § 3B1.3 (U.S. Sentencing Comm'n 2018).[4]

### III. CONCLUSION

For these reasons, we will affirm the District Court.

---

[3] The separate "double-dipping scheme" involved withdrawing voucher funds from the escrow account twice. (App. at 1446.)

[4] Nor, as Tull argues, is her sentence unreasonable for her age. The District Court considered the factors specified in 18 U.S.C. § 3553, including Tull's history, characteristics, offenses, and victims, before departing downward from the Guidelines.