# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
SALUSSOLIA, ALDYKIEWICZ, and EWING
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Sergeant First Class CORRY P. BROOKS**
**United States Army, Appellant**

ARMY 20170087

Headquarters, Fort Bragg
Jeffery R. Nance and S. Charles Neill, Military Judges
Lieutenant Colonel Edward Linneweber, Acting Staff Judge Advocate

For Appellant:  Lieutenant Colonel Christopher D. Carrier, JA; Major Julie L. Borchers, JA; Captain Steven J. Dray (on brief).

For Appellee:  Lieutenant Colonel Eric K. Stafford, JA; Major Hannah E. Kaufman, JA; Captain Meredith M. Picard, JA (on brief).

5 July 2019

--------------------------------
OPINION OF THE COURT
--------------------------------

ALDYKIEWICZ, Judge:

Appellant argues the military judge erred in his application of the Jencks Act, 18 U.S.C. § 3500, and Rule for Courts-Martial [R.C.M.] 914, by not striking the victim's direct testimony at trial.  We disagree and hold that, at a minimum, a statement is not "in the possession of the United States" for purposes of the Jencks Act and R.C.M. 914 when it is: (1) made to state law enforcement, and (2) not part of a joint investigation.

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of four specifications of rape and one specification of assault consummated by a battery, in violation of Articles 120 and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 928 [UCMJ].  The military judge sentenced appellant to a dishonorable discharge, confinement for fourteen years, and reduction to the grade of E-1.  The convening authority approved the adjudged sentence and credited appellant with sixteen days against his sentence to confinement.

Appellant's case is now before us for review under Article 66, UCMJ.[1] Appellant's sole assigned error, that "the military judge erred in his application of the Jencks Act, 18 U.S.C. § 3500 and Rule for Courts-Martial 914," warrants discussion but no relief. Although not raised, appellant's multiple convictions for offenses prosecuted using "alternate theories of liability" to address "exigencies of proof" when prosecuting singular acts does raise legal error requiring remedial action by this court, which we take in our decretal paragraph.

## I. BACKGROUND

*Appellant's Rape and Assault of LB*

Appellant met his victim, LB, online, meeting in-person some time in 2013. Approximately one year later, on 12 May 2014, they met again; in the early morning hours of 13 May 2014, appellant raped and assaulted LB.

The evening of 12 May 2014, appellant and LB went out for dinner and eventually returned to his home, where LB changed into a pair of "boxers and a t-shirt," clothing appellant provided her. After changing, appellant and LB watched television together and they kissed, a kiss LB initiated. Appellant then placed his hand on LB's breast, but LB, believing things were moving too fast, immediately pushed his hand away. This enraged appellant. He told her to "get the fuck out of his clothes, he was taking [her] the fuck home." Frightened, LB changed back into her clothes. At this point, appellant said, "Fuck that. You're giving me fucking head . . . . You're giving it to me now and you're going to give it to me on the way home. You're giving me fucking head or I'm going to throw you in the woods and good luck with getting home."

Frightened, LB asked if she could use the bathroom to "freshen up." While in the bathroom, LB called 911, but was disconnected. Appellant forced the bathroom door open and choked LB, causing her to black out.

The next thing LB recalls is waking up to appellant choking her in his vehicle as she tried to escape. Appellant ordered her to perform oral sex on him as he drove. Holding her head down, appellant forced LB's compliance with his demand. Eventually, appellant allowed LB to roll down the window to have a cigarette. LB jumped out of the window and took off running. Her escape efforts, however, failed. Appellant gave chase, caught her, and dragged her back to his vehicle. Having

---

[1] Pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), appellant personally asserted four additional claims of error. We have considered appellant's matters under *Grostefon* and find they merit neither discussion nor relief.

prevented LB's successful escape, appellant continued his drive to LB's home, during which he again ordered LB to perform oral sex on him, which she did.

As they passed the road to LB's house, LB asked appellant "why are you passing the road?" Appellant responded that they would "fuck" before he took her home. He then proceeded to drive around, eventually stopping at the end of a dead-end road near LB's home. Once stopped, appellant ordered LB to take off her clothes and get in the backseat of his vehicle, where appellant again raped LB.

Finished with LB, appellant ordered her to get dressed, drove her the short distance to her home, and left the area. LB immediately called 911 and reported that she had been raped.

*LB's Interview and Statement to the Lee County Sheriff's Office*

On 13 May 2014, within hours of the rape, LB was interviewed by a Lee County Sherriff's Office (LCSO) detective, Detective W. The interview lasted a total of three and a half hours and was recorded (audio only). After approximately the first two hours of the interview, Detective W and LB took a break. When they returned, the interview continued for another hour and a half. Because LB's writing hand was fractured, Detective W hand-wrote LB's statement while in the interview room. At the close of the interview, they proceeded to Detective W's office where he typed her statement. After reviewing both the handwritten and typed statements for accuracy and truthfulness, LB signed the typewritten statement.

The LCSO interview room used on 13 May 2014 had continuous recording capability, meaning it was in record mode at all times regardless of whether an interview was in progress. By all accounts, on 13 May 2014, the system was operational and recorded LB's interview in its entirety. At the time, the system automatically overwrote recordings depending on hard drive space requirements. As a result, recordings (e.g., interviews) were only maintained on the system's hard drive for fourteen to twenty-eight days.

On 27 May 2014, two weeks after LB's interview, Detective W extracted what he believed was the complete LB interview. Extraction occurred by querying the system using the start and end times of the interview and transferring the recording for the queried period from the hard drive to a compact disc. Detective W queried the system for the period immediately preceding his initial entry into the interview room with LB and their break as indicated by their departure from the interview room and his turning off of the interview room lights, mistakenly believing the latter event to be the termination of the interview rather than the start of their break. Detective W forgot that he and LB returned to the interview room following their break where the interview continued for another hour and a half.

Detective W's oversight went undetected for over thirty-two months; his failure to extract the entire interview was not discovered until 10 February 2017 when the government was preparing LB for trial.

No military personnel were present during LB's interview at the LCSO. After the interview, the LCSO detective briefed an agent with the United States Army Criminal Investigation Command (CID) office at Fort Bragg due to appellant's status as an active duty soldier.

At trial, appellant's defense counsel moved to preclude LB from testifying, citing both the Jencks Act and R.C.M. 914. Following a pretrial motions hearing and after receiving testimony from Detective W, the military judge denied the defense motion. Specifically, the military judge held the lost portion of LB's interview was never in the possession of the United States and therefore, no violation of the Jencks Act or R.C.M. 914.[2]

> Among his essential findings of fact, the military judge noted:
>
> On or about 13 May 2014, Ms. [LB] (the alleged victim) gave multiple statements to civilian law enforcement, including statements at a local hospital and at a local sheriff's office. She made these statements within hours of the charged offenses. No one from military law enforcement was present when these statements were made. Detective [W] of the [LCSO] interviewed the alleged victim. For the statements relevant for this motion, Detective [W] conducted an interview of the alleged victim in an interview room at the sheriff's office.
>
> The entire interview at the sheriff's office lasted approximately three-and-half hours. When civilian law enforcement attempted to transfer the recorded interview, only the first two hours were transferred. The remaining 90 minutes was not transferred and was deleted from the original media source. According to Detective [W], this deletion is automatic within one month of a recording being made.

---

[2] The military judge also found that the "law enforcement and the government acted in good faith and provided the [preserved portion of the] recording to the Defense in a timely manner."

The [c]ourt finds the missing portions of the alleged victim's interview would have been deleted no later than 13 June 2014.

The [c]ourt finds that this investigation was not "joint" in any sense of the word until July or August 2014. In reviewing the agent notes, the [c]ourt determines that CID was providing minimal assistance to local law enforcement. In June 2014, CID began investigating an alleged larceny of smoke grenades which triggered a seemingly-intensive CID investigation . . . However, throughout all entries, CID was not investigating the charged offenses. On 15 July 2014, the agent notes show two attempts to contact Detective [W] to determine if needs (sic) "any other assistance." There was no evidence that CID provided anything aside from basic support to this civilian law enforcement inquiry.

To the contrary, Detective [W] testified that CID was present during a search of the accused's on-post residence.[3] No one from CID collected evidence during this search. Notably, there were smoke grenades seized that law enforcement believed may have been stolen. Even though there was possible stolen military property, CID did not take the evidence; rather, civilian law enforcement seized and inventoried the smoke grenades. This further supports the conclusion that this investigation was conducted by civilian law enforcement, as opposed to a "joint" investigation with the military.

Detective [W] testified that the local district attorney's office eventually recommended the accused be tried in military court. According to Detective [W], this decision was made in July or August 2014 because civilian

---

[3] On 13 May 2014, the LCSO executed a search of appellant's residence. Appellant points out in his brief, properly so, that the military judge mistakenly referred to appellant's "on-post" residence when discussing the search executed by LCSO personnel, a search in which CID personnel were present. Appellant's residence was "off post." With that one exception, we find the military judge's findings of fact to be supported by the record; this one "clearly erroneous" fact is non-dispositive to our ruling.

prosecutors believed the military could more easily admit evidence under [Mil. R. Evid.] 404(b), to include evidence about similar offenses against the accused's former wife. This timeline matches the agent's notes regarding Ms. [K] (the former wife) in mid-July 2014.[4]

There was no evidence presented that law enforcement acted in bad faith or in a negligent manner in recording [LB]'s statement on 13 May 2014.

The [c]ourt found Detective [W] to be a credible witness. He answered questions candidly and did not appear to have a bias.

The [c]ourt finds that law enforcement and the Government acted in good faith and provided the recording to the Defense in a timely manner.

## II. LAW AND DISCUSSION

### A. The Jencks Act and R.C.M. 914

#### 1. Standard of Review

A military judge's decision whether to strike testimony under the Jencks Act and R.C.M. 914 is reviewed for abuse of discretion. *United States v. Muwwakkil*, 74 M.J. 187, 191 (C.A.A.F. 2015) (citations omitted). An abuse of discretion occurs when a military judge's findings of facts are clearly erroneous or his conclusions of law are incorrect. *United States v. Olson*, 74 M.J. 132, 134 (C.A.A.F. 2015) (citation omitted). We conclude the military judge did not abuse his discretion by allowing LB to testify.

#### 2. Purpose of the Jencks Act and R.C.M. 914

The Jencks Act, enacted in 1957, requires the military judge, upon motion by the accused, to order the government to disclose prior statements of its witnesses, *in the possession of the United States*, that are related to the subject matter of their testimony after the witness testifies on direct examination. *See* 18 U.S.C. § 3500. "In 1984, the President promulgated R.C.M. 914, and this rule 'tracks the language

---

[4] The case was officially turned over to military authorities for disposition in April 2015.

of the Jencks Act, but it also includes disclosure of prior statements by defense witnesses other than the accused.'" *Muwwakkil*, 74 M.J. at 190 (C.A.A.F. 2015) (citations omitted).  The purpose of both the Jencks Act and R.C.M. 914 is "to further the fair and just administration of criminal justice by providing for disclosure of statements for impeaching government witnesses." *Id.* (citing *Goldberg v. United States*, 425 U.S. 94, 107 (1976)) (further citation and internal quotation marks omitted).

### 3.  Scope of the Jencks Act and R.C.M. 914

A statement under the Jencks Act includes "a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by the said witness and recorded contemporaneously with the making of such an oral statement."  18 U.S.C. § 3500(e)(2).  Similarly, an R.C.M. 914 statement includes "[a] substantially verbatim recital of an oral statement made by the witness that is recorded contemporaneously with the making of the oral statement and contained in stenographic, mechanical, electrical, or other recording or a transcription thereof."  R.C.M. 914(f)(2).  In short, an audio recording of a witness interview is a "statement" for both Jencks Act and R.C.M. 914 purposes.

### 4.  Remedies for Violations

Where the United States fails to produce a requested Jencks Act covered statement, "the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared."  18 U.S.C. § 3500(d).  A similar remedy is found in R.C.M. 914 which states, "[i]f the other party elects not to comply with an order to deliver a statement to the moving party, the military judge shall order that the testimony of the witness be disregarded by the trier of fact and that the trial proceed, or, if it is the trial counsel who elects not to comply, shall declare a mistrial if required in the interest of justice."  R.C.M. 914(e).

The "strike" or "mistrial" remedy is not absolute.  "A trial court has the discretion not to impose sanctions for noncompliance with the dictates of the Jencks Act." *United States v. Sterling*, 742 F.2d 521, 524 (9th Cir. 1984); *see also*, *United States v. Young*, 916 F.3d 368, 383 (4th Cir. 2019) (no abuse of discretion by granting continuance instead of striking testimony for Jencks Act violation when government's last-minute disclosures were not the result of bad-faith).

That the Jencks Act, R.C.M. 914, and the remedies therein extend to lost or destroyed statements of witnesses previously in the possession of the United States is well settled.  *See Muwwakkil*, 74 M.J. at 193 (C.A.A.F. 2015) ("judicial interpretations of the Jencks Act by the Supreme Court, our predecessor Court, and

the federal circuit courts, all [ ] have applied the Jencks Act to destroyed or lost statements") (citations omitted).

### 5. *"In the possession of the United States"*

"[T]he key question posed by most courts [in Jencks Act cases] is that of possession." *United States v. Fort*, 472 F.3d 1106, 1117 (9th Cir. 2007). Appellant's Jencks Act and R.C.M. 914 claim hinges on that very issue: whether the lost audio recording of LB's interview (the last hour and a half of her interview) [hereinafter LB's statement] was in the possession of the United States at any time between its initial creation and ultimate loss (13 May 2014 through 13 June 2014).

"A statement is 'in the possession of the United States' for Jencks Act purposes if it is in the possession of a federal prosecutorial agency.'" *United States v. Naranjo*, 634 F.3d 1198, 1211-12 (11th Cir. 2011) (citation omitted). The Jencks Act does not apply to statements in the possession of foreign law enforcement officials or state law enforcement officials. *See, e.g., United States v. Lee*, 723 F.3d 134 (2d Cir. 2013) (Jencks Act creates no obligation to provide statements in the possession of foreign law enforcement officials); *United States v. Weaver*, 267 F.3d 231, 245 (3d Cir. 2001) (Jencks Act does not apply to evidence in the possession of state authorities).

### 6. *Joint Investigation*

The prosecutorial arm of the federal government may, in certain cases, include non-federal entities such as the LCSO when the non-federal entity is acting in concert with (e.g., jointly) or at the behest of the federal government as its agent. *See United States v. Moeckly*, 769 F.2d 453, 463 (8th Cir. 1985) (Jencks act does not apply to statements made to state officials when not a joint investigation with federal authorities") (citations omitted).

If the LCSO and CID were involved in a "joint" investigation, the disclosure obligations of the Jencks Act and R.C.M. 914 apply. *See, e.g., United States v. Reyeros*, 537 F.3d 270, 283-284 (3d Cir. 2008) (United States under no obligation to provide Colombian investigation and documents that: the United States never saw, were inaccessible to the United States, were not part of a joint investigation, and were not prepared as a result of an investigation over which the United States had direction or control). Stated another way, the prosecution cannot stand on a technicality and say they did not have actual possession of LB's statement if the statement was obtained as part of a "joint" investigation or by "agents" of the federal government. *See, e.g., United States v. Heath*, 580 F.2d 1011, 1018-1019 (10th Cir. 1978).

To resolve the above questions, one looks to the type of relationship, if any, between the non-federal entity in possession of the statement at issue and the United States authorities prosecuting the case. This is a case-by-case, fact specific inquiry. This court's comment in *United States v. Redd*, 67 M.J. 581 (Army Ct. Crim. App. 2008) in assessing the joint nature of an investigation for Article 31, UCMJ purposes is equally apropos to a Jencks Act and R.C.M. 914 disclosure scenario. In *Redd*, we noted: "We look to the surrounding facts to determine whether an investigation is joint or separate for purposes of applying Article 31 rights warning requirements and are not bound by the characterization of the investigation by civilian or military law enforcement agencies." *Id*. at 587.

Appellant provides no date certain of when the LCSO investigation joined or was joined by CID. His pleadings at the trial level as well as on appeal, however, make clear that appellant's argument is that CID and the LCSO were engaged in a joint investigation at some time on or before the loss of LB's statement (13 June 2014).

### 7. *Actual Possession*

In support of his claim that CID was involved in a "joint" investigation, and therefore had actual possession of LB's lost statement, appellant alleges, *inter alia*:

> CID worked with a law enforcement agency to (1) secure a suspect, (2) secure his keys, (3) secure his cell phone, (4) secure his vehicle, (5) seek out and receive a search authorization from a military magistrate, even where LCSO seemed to have its own authorization, (6) execute the search authorization on the suspect's person and vehicle, (7) execute the search authorization of an *off-post* residence of a Soldier, located more than twenty-six miles from their CID office, (8) turn evidence over to LCSO, (9) brief multiple commanders, and (10) brief the Army prosecutor on the case.[5]

(emphasis in original).

---

[5] The listing of activities provided by appellant are all focused on CID's action related to the sexual assault of LB and not related to CID's separate and unrelated larceny investigation.

9

As further support of his position, appellant adds: "[s]ecuring suspects, locating evidence, and securing and executing search authorizations *is* law enforcement." (emphasis in original).

There is a difference between routine federal-state cooperation and "joint" investigations. Without question, the list of activities cited by appellant is properly characterized as law enforcement activity. The test, however, is not whether CID was engaged in law enforcement activity during the period when LCSO interviewed LB about the rape. Rather, the question is whether CID was part of a "joint" investigation with LCSO, or whether Detective W was acting as an agent of CID.

To accept appellant's list of activities as proof of the "joint" nature of the investigation would be tantamount to a pronouncement that any CID involvement in a state criminal investigation transforms that investigation into a "joint" investigation for Jencks Act and R.C.M. 914 purposes; it does not. It is hard to imagine a situation where CID and/or military authorities will not be involved in a search and/or seizure by civilian authorities executed on a military installation.

As the Second Circuit noted, "The investigation of crime increasingly requires [ ] cooperation." *United States v. Getto*, 729 F.3d 221, 231 (2d Cir. 2013). Rendering assistance to local law enforcement officers (e.g., state or foreign authorities), whether "minimal" as the military judge found in appellant's case or otherwise, does not transform a separate and independent civilian investigation into a "joint" investigation. Similarly, conducting a parallel investigation (e.g., simultaneous yet separate, independent investigations) does not make the federal government accountable for the actions of non-federal entities, in this case, the LCSO personnel. Appellant cites no authority stating otherwise and we have found none.

*8. Constructive Possession*

In addition to arguing "actual possession" due to the alleged "joint" nature of the LCSO investigation, appellant argues that "CID had constructive possession [of LB's statement] and cannot simply reject culpability and place all negligence on the LCSO." Appellant cites no authority in support of his argument that CID somehow had constructive possession of LB's lost statement. Accordingly, we find his claim meritless.

In addressing constructive possession, the Third Circuit looked to three factors:

> (1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a

10

'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence.

*Reyeros*, 537 F.3d at 281 (3d Cir. 2008). By analogy, in addressing imputation, albeit in a *Brady* context, the Eleventh Circuit noted: "Knowledge of information that state investigators obtain is not imputed for *Brady* purposes to federal investigators who conduct a separate investigation when the separate investigative teams do not collaborate extensively." *Naranjo*, 634 F.3d at 1212 (citation omitted).

On 13 May 2014, CID did not participate in LB's interview. The interview was not at the behest or direction of CID. At no time between 13 May 2014 and 13 June 2014 was LCSO acting on behalf of CID or under its direction or control. To the extent that assistance was provided by CID, it was in those areas where LCSO had little to no option but to seek assistance: entry onto a military installation to arrest appellant while at work, search his person, and search his vehicle on the installation at the time. While information was exchanged, "resources" were not shared and to the extent that any evidence was found during the relevant period, the evidence was secured and maintained by LCSO, not CID; CID did not have "ready access" to the LCSO evidence. At no time did CID have access to, let alone dominion or control over, LB's lost statement.

The military judge did not abuse his discretion in finding no Jencks Act or R.C.M. 914 violation. Having found that the statement at issue was never in the actual or constructive possession of the United States, we need not and do not address whether the loss was willful, reckless, negligent, or in accordance with then existing procedures at LCSO. Furthermore, we need not characterize the loss as resulting from a "good faith" or "bad faith" loss. Finally, whether or to what extent appellant may have been prejudiced, if at all, by the loss need not be addressed.

*B. Factual Sufficiency and Alternate Theories of Liability*

Appellant stands convicted of four rape offenses all stemming from his actions on 13 May 2014. The evidence and record reveals, however, only three discrete sexual acts, each charged under alternate theories of liability.

On 13 May 2014, appellant raped LB three times. The first rape occurred when appellant and LB initially departed his home in his vehicle en route to LB's residence and prior to her failed escape attempt [first rape]. The second rape occurred after appellant captured LB following her failed escape and before appellant directed LB to undress and get in the backseat of his vehicle [second rape]. The third and final rape occurred in the backseat of appellant's vehicle [third rape]. The first and second rapes involve insertion of appellant's penis in LB's mouth

while in the front seat of appellant's vehicle; the third rape involves appellant's penile penetration of LB's vulva.

Specification 4 of Charge I (rape by threatening or placing victim in fear) and Specification 5 (rape by unlawful force) address the third rape. During its opening, the government noted that the pleadings were charged in the "alternative," a position that they confirmed prior to findings. When the military judge asked the parties how to handle the alternative pleadings, both the government and defense agreed that appellant could be found guilty of both specifications but they would be merged for sentencing; the military judge agreed and did just that, entering findings of guilty for both Specifications 4 and 5 of Charge I and merging them for sentencing.

Specification 6 of Charge I (rape by threatening or placing victim in fear) and Specification 7 (rape by unlawful force) address the first and second rapes. Both specifications allege rape on "divers occasions." By charging "divers" occasions, the pleadings alleged "two or more occasions."[6] Neither counsel nor the military judge addressed whether the pleadings were "in the alternative." However, a review of the record reveals that, notwithstanding the parties' silence, Specifications 6 and 7 were in fact charged in the alternative. In other words, the first and second rapes were charged under a "by threatening or placing in fear" theory (Specification 6 of Charge I) as well as under an "unlawful force" theory (Specification 7 of Charge I).

If left undisturbed, the findings portray an appellant who engaged in and stands convicted of four rapes of [LB] covering six sexual acts: Specification 4 (one act of rape), Specification 5 (one act of rape), Specification 6 ("two or more" rapes), and Specification 7 ("two or more" rapes). Regarding sentencing, only Specifications 4 and 5 were merged for sentencing; the alternative nature of Specifications 6 and 7 was not addressed at sentencing.

### 1. Factual Sufficiency

This court "may affirm only such findings of guilty . . . as it finds correct in law and fact." UCMJ art. 66(c). "We must conduct an independent review of both the legal and factual sufficiency of the evidence. In doing so, our court reviews de novo the legal and factual sufficiency of the case." *United States v. Gilchrist*, 61 M.J. 785, 793 (Army Ct. Crim. App. 2005). The test for factual sufficiency is "whether, after weighing the evidence of record and making allowances for not having personally observed the witnesses, we are convinced of appellant's guilt beyond a reasonable doubt." *Id.* (citing *United States v. Turner*, 25 M.J. 324, 325

---

[6] *See* Dep't of the Army, Pam. 27-9, Legal Services: Military Judges' Benchbook, para. 7-25 (10 Sep. 2014).

(C.M.A. 1987)). "[T]o sustain appellant's conviction, we must find that the government has proven all essential elements and, taken together as a whole, the parcels of proof credibly and coherently demonstrate that appellant is guilty beyond a reasonable doubt." *Id.* (citations omitted).

On the record before us, we are convinced that appellant committed a sexual act upon LB, on divers occasions (i.e., first and second rape), by threatening and placing LB "in fear that she would be subjected to death and grievous bodily harm and kidnapping." In other words, we are convinced that Specification 6 of Charge I is factually sufficient. Regarding Specification 7 of Charge I, while the government introduced sufficient evidence that appellant accomplished the first rape by "grabbing [LB's] head and forcing her mouth onto his penis with his hand," there was no such evidence of the same or similar assaultive behavior presented, direct or otherwise, regarding the second rape. As a result, the prosecution failed to establish "divers occasions" for Specification 7 of Charge I. We therefore dismiss the language "on divers occasions" from Specification 7 of Charge I, leaving a finding of guilt as to a single rape by unlawful force (first rape).

### 2. Alternate Theories of Liability

We next address how appellant was tried for committing *three* discrete sexual acts but was convicted of *six* sexual acts.

Our superior court has explained that when an appellant stands convicted of two specifications "charged [in the alternative] for exigencies of proof," we are required "either to consolidate or dismiss a specification." *United States v. Elespuru*, 73 M.J. 326, 329 (C.A.A.F. 2014) (citing *United States v. Mayberry*, 72 M.J. 467, 467-68 (C.A.A.F. 2013)).

In such circumstances, dismissal of one specification "is particularly appropriate given the nuances and complexity of Article 120, UCMJ, which make charging in the alternative an unexceptional and often prudent decision." *Elespuru*, 73 M.J. at 329-30. This guidance is apropos to this case. Accordingly, Specification 5 of Charge I and Specification 7 of Charge I, as modified by our factual sufficiency review, shall be conditionally dismissed.

### C. Sentence Reassessment

Applying the principles of *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986) and the factors set forth in *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013), we conclude that we can confidently reassess appellant's sentence without returning this case for a sentence rehearing.

BROOKS—ARMY 20170087

Our modified findings, affirming two rape convictions (Specification 4 of Charge I and Specification 6 of Charge I) and conditionally dismissing Specification 5 of Charge I and the modified Specification 7 of Charge I results in no reduction of appellant's maximum sentence exposure. Before any adjustment to the findings, appellant faced a maximum punishment of a dishonorable discharge, confinement for life without the eligibility of parole, forfeiture of all pay and allowances, and reduction to E-1. His maximum sentence following the conditional dismissal of Specifications 5 of Charge I and modified Specification 7 of Charge I is unchanged.

As for the finding of guilt related to Specification 5 of Charge I, we have no doubt that this finding, conditionally dismissed by us herein, resulted in no prejudice to appellant. The military judge merged, for sentencing purposes, Specification 4 of Charge I with Specification 5 of Charge I. As for the finding of guilt related to the original Specification 7 of Charge I (finding criminal acts "on divers occasions"), we are equally confident that this finding of guilt, as modified and likewise conditionally dismissed by us herein, resulted in no prejudice to appellant.

The admissible aggravation evidence before the court, a military judge sitting alone, is unchanged by the modified findings herein. The horror story told by LB regarding the events of 13 May 2014 is the same notwithstanding the modified findings; the remaining offenses capture the gravamen of appellant's crimes – first strangling LB with his hands around her neck and then three successive, discrete, and violent rapes of her.

Finally, appellant's remaining convictions are ones that members of this court have experience and familiarity with such that we can reliably determine what sentence would have been imposed at trial.

Based on the entire record, we conclude the military judge would have imposed a sentence of at least that which was approved.

**CONCLUSION**

The findings of guilty as to Specification 4 of Charge I is AFFIRMED. Specification 5 of Charge I will be DISMISSED upon Specification 4 of Charge I surviving "final judgment" of the proceedings. The findings of guilty as to Specification 6 of Charge I is AFFIRMED. Specification 7 of Charge I, as modified herein by dismissal of the language "on divers occasions" will be DISMISSED upon Specification 6 of Charge I surviving "final judgment" of the proceedings. *See* UCMJ, art. 71(c)(1) (defining "final judgment"). Specification 3 of Charge II is AFFIRMED. The sentence is AFFIRMED.

14

Senior Judge SALUSSOLIA and Judge EWING concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court